NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250250-U

NO. 4-25-0250

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 9, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|     Petitioner-Appellee, | ) | No. 19JA240 |
|     v. | ) | |
| Rico P., | ) | Honorable |
|     Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, granting appellate counsel's motion to withdraw and finding the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In April 2024, the State filed a petition for termination of parental rights against respondent, Rico P., the father of T.F. (born in January 2013). In February 2025, the trial court granted the State's petition and terminated Rico P.'s parental rights.

¶ 3    On appeal, appellate counsel has filed a motion to withdraw her representation of respondent pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing Rico P.'s appeal presents no potentially meritorious issues for review. We agree with counsel. Accordingly, we grant the motion and affirm the trial court's judgment terminating Rico P.'s parental rights.

¶ 4                           I. BACKGROUND

¶ 5    In August 2019, the State filed a petition for adjudication of wardship, alleging

T.F. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because T.F.'s environment was injurious to her welfare due to domestic violence between her mother and her mother's paramour. The petition named Rico P. as T.F.'s father and further noted T.F. had previously been a ward of the court from January 16, 2014, to August 10, 2016, in Peoria County case No. 14-JA-8.

¶ 6          Rico P. did not appear at the arraignment on August 12, 2019, but the State established him as T.F.'s father by producing a voluntary acknowledgement of paternity. Despite diligent efforts, the State could not perfect service on Rico P., so it served him by publication. On October 21, 2019, the trial court issued an arraignment order finding Rico P. defaulted. The court adjudicated T.F. neglected on October 29, 2019, and entered a dispositional order the same day; however, it made no findings as to Rico P. since he had not been located.

¶ 7          Rico P. did not participate in this case until April 2021, when he reached out to T.F.'s caseworker and then phoned into a child and family team meeting. The State filed a petition to terminate Rico P.'s parental rights on July 15, 2021, and he appeared in court to cure his default in August. An October 2021 service plan noted Rico P. had not yet been ordered to complete services "due to the recentness of his involvement in the case." The trial court denied the State's termination petition in April 2022, finding the State had not proved Rico P. unfit by clear and convincing evidence.

¶ 8          On May 27, 2022, T.F.'s caseworker submitted a permanency report to the trial court. It noted Rico P. lived alone in a cluttered, dirty two-bedroom apartment. The caseworker documented having a difficult time communicating with Rico P. because he was soft-spoken and did not appear to understand the questions. The report noted Rico P. sent gifts for nine-year-old T.F., including used ChapStick, used hair products, frozen chicken wings, spicy peppers, a men's

undershirt, a neck cover, Slim Jims, expired pretzels, and men's deodorant. The caseworker noted she completed an integrated assessment with Rico P., although his mother had to assist him in answering questions or providing information. His mother revealed Rico P. previously suffered a brain aneurysm and stroke, which required him to undergo brain surgery. The caseworker outlined her concerns relating to Rico P.'s ability to complete services because he could not complete services in case No. 14-JA-8. The report noted Rico P.'s mother and T.F.'s foster mother arranged for visitation between Rico P. and T.F.

¶ 9        The trial court entered a permanency review order in June 2022, directing the Illinois Department of Children and Family Services (DCFS) to refer Rico P. for a psychological evaluation and apply the results to help Rico with his cognitive abilities. The court also ordered the agency to refer Rico P. for parenting coaching.

¶ 10        In September 2022, Rico P. underwent a psychological assessment, which yielded two diagnoses, schizophrenia and substance use disorder. In various cognitive functioning tests, Rico P. scored in the average to low-average ranges. The report noted Rico P. could learn information presented in treatment and parenting classes, but he would "need some supports." The report further noted Rico P. would need "to see safe, effective parenting skills modeled for him." The assessment produced several recommendations, including for him to attend individual therapy regularly, continue current medication management, continue seeing a psychiatrist, and participate in family therapy, parenting and child development classes, and Narcotics Anonymous or Alcoholics Anonymous.

¶ 11        On May 10, 2023, the trial court entered a dispositional order, finding Rico P. "unfit and unable for some reason other than financial circumstances alone, to care for, protect, train, or discipline [T.F.]" The court based this on Rico P.'s "previous unfitness on this same

child in 14-JA-08 on 03/27/2014 disposition [and] failure to complete services to prove his fitness to parent, unable because of his unsuitable apartment." The court ordered Rico P. to cooperate with DCFS and participate in the following services: a drug/alcohol assessment and any recommended treatment, drug drops twice monthly, a mental health assessment and any recommended treatment, counseling (which can address domestic violence), parenting classes, and supervised visitation.

¶ 12        In a July 2023 permanency review, T.F.'s caseworker reported Rico P. continued seeing his psychiatrist, but he had not started other services. His apartment was cleaner than before, and he held a job. He had been referred for parenting coaching through Crittenton Center, but he did not return calls or letters, so he was dropped from the coach's caseload and wait-listed. He had not undergone a substance abuse assessment, nor had he done any drug drops.

¶ 13        By the December 2023 permanency review, Rico P. had started parenting coaching at Crittenton Center and individual counseling at the Human Service Center (HSC). He still saw his psychiatrist, but he refused substance abuse counseling or treatment. He completed five random drug screens, all of which tested positive for tetrahydrocannabinol (THC). Rico P. had not visited T.F. since May 2023. The report noted, "[T.F.] and [Rico P.] do not have a strong relationship, per their own reports." They did not know how to engage with one another, and Rico P. appeared "fairly withdrawn into himself during most social interactions, and it is reported that these tendencies do not change during visits with [T.F.]"

¶ 14        On April 5, 2024, the State filed a petition for termination of parental rights, alleging Rico P. was an unfit person on two statutory grounds: (1) he failed to make reasonable progress toward the return of T.F. to his care during any nine-month period following the neglect adjudication, specifically, July 8, 2023, to March 8, 2024 (750 ILCS 50/1(D)(m)(ii) (West 2024))

and (2) he failed to maintain a reasonable degree of interest, concern, or responsibility for T.F.'s welfare (750 ILCS 50/1(D)(b) (West 2024)). The petition also alleged terminating his parental rights served T.F.'s best interest. Rico P. answered the petition on May 5, 2024, denying the allegations.

¶ 15        The trial court held a fitness hearing on the State's petition over two days on December 2, 2024, and January 27, 2025. The court confirmed the State filed an amended petition in November, correcting an error in the relevant nine-month period by extending it to April 8, 2024. The State asked the court to take judicial notice of the current court file and the prior juvenile case involving T.F. (case No. 14-JA-8), which the court did. Without objection, the State next moved to admit several exhibits relating to Rico P., namely, his service plans, the psychological evaluation, counseling notes from October 2023 to February 2024, visitation records, a drug testing referral for the relevant nine-month period, drug testing records, and a certificate showing he completed a parenting class in January 2024.

¶ 16        The State called Amanda Schenk, who acted as T.F.'s caseworker from January 2021 through December 2023. She confirmed Rico P. was T.F.'s legal father. She testified that Rico P. had been ordered to complete parenting education, individual counseling, drug drops, a psychological evaluation, and a substance abuse assessment. Schenk noted Rico P. completed a psychological assessment, but she could not remember when it occurred. Nevertheless, she could recall the recommendations from the assessment included that Rico P. undergo individual therapy, family therapy, medication management, and a substance abuse assessment. Schenk testified Rico P. did not complete a substance abuse assessment between July and December 2023. She stated she talked with Rico P. about completing the assessment at least twice. Schenk testified Rico P.'s case manager at HSC, where he saw his psychiatrist, had also recommended a

substance abuse assessment and Rico P. "declined it every single time." HSC also helped Rico P. with budgeting, grocery shopping, chores, and errands when his family could not. Schenk noted Rico P. began individual counseling in October 2023, but he had not started family counseling.

¶ 17    Schenk next testified she both explained the drug testing process with Rico P. and gave him written instructions "multiple times." She testified he did not consistently complete drug drops during the relevant nine-month period, estimating he missed half of his drug tests from July to December 2023.

¶ 18    Schenk testified Rico P. did not consistently visit T.F. during the nine-month period. She recalled visits stopped in May 2023, when Rico P.'s mother either declined visits or stopped responding to phone calls from T.F.'s foster mom. Rico P. did not report this to Schenk until October 2023. She noted Rico P. relied on his mother to help him communicate with others or make appointments. Schenk testified that as of December 31, 2023, Rico P. was not a viable return home option for T.F. She based her view on Rico P.'s failure to complete services, noting "[h]e had just started individual counseling" and his relationship with T.F. "needed some extensive work to get them to a place where [T.F.] would be comfortable going even closer to that kind of a goal."

¶ 19    On cross-examination, Schenk testified she was concerned about Rico P.'s marijuana use, yet she never smelled marijuana on him or saw him intoxicated during the relevant nine-month period. She did note, however, that his drug drops during this time tested positive for THC. Schenk stated Rico P. lived in an apartment by himself and there were no major safety concerns with his living arrangements. She explained she arranged for supervised visits to resume at the agency in October or November 2023 once she learned visits had stopped. Schenk testified Rico P. was not offered family therapy during the relevant nine-month period.

¶ 20        The State next called Shannon Doubet, who testified she was T.F.'s current caseworker and had been the case supervisor from January 2024 to July 2024. Doubet testified that as of April 8, 2024, Rico P. had not completed several services, including "a substance abuse assessment, continuing to complete two drug drops a month, engaging in individual counseling, and one-on-one parenting coach." She elaborated Rico P.'s drug drops were inconsistent.

¶ 21        Doubet next testified Rico P. was consistently visiting with T.F. in April 2024 but noted she did not observe their visits. Doubet testified Rico P. was not a viable return home option for T.F. because "[h]e still has outstanding services as well as ongoing concerns with his ability to meet [T.F.'s] needs as far as understanding where she is developmentally and what she needs."

¶ 22        On cross-examination, Doubet testified she referred Rico P. for parenting coaching during the relevant nine-month period (July 2023 to April 2024). She noted he participated in parenting coaching but did not complete it during that time. She confirmed Rico P. attended his psychiatric appointments during those months. Doubet testified she never saw or received reports of Rico P. "being in an inebriated or intoxicated state during any of [his] visits" with T.F.

¶ 23        Rico P. testified in support of his position he was not an unfit person. He recalled he underwent a psychological evaluation in 2022. He likewise confirmed he had lived in the same apartment since November 2022 and a caseworker had inspected it. He presented no other evidence.

¶ 24        After closing arguments from the parties and guardian *ad litem* (GAL), the trial court took a brief recess to consider the matter before announcing its decision. The court explained it had the opportunity to reflect on the evidence and arguments. The court first

addressed the State's allegation Rico P. failed to maintain a reasonable degree of interest, concern, or responsibility in the case. It noted Rico P.'s sporadic visitation and his unexplained late entry into the case. The court observed Rico P. "was not present for an extended period of time" and determined, "That I think alone shows a lack of concern or interest in the child, and the Court would find the State has proven that count by clear and convincing evidence."

¶ 25     Turning to the allegation Rico P. failed to make reasonable progress during the nine-month period of July 8, 2023, to April 8, 2024, the trial court noted "it's very clear— abundantly clear to me that he had not made reasonable progress toward the return of his child to his care." The court found, "We were no closer to a return home in April of 2024, then we were at the beginning of the nine-month period of time in July of 2023." It observed Rico P. "still was struggling in most aspects of his life and was not a viable return home target." Consequently, the court found the State proved this unfitness count by clear and convincing evidence.

¶ 26     The parties reconvened before the trial court on February 26, 2025, for a best-interest hearing. The State called Todd Condron, who testified he worked as a Court Appointed Special Advocate (CASA). He confirmed he was assigned to T.F.'s case in 2019. Condron testified T.F. told him her thoughts about returning home over the years by completing all-about-me forms. In December 2019, T.F. wrote she loved her foster parents, her siblings, and biological mother. She wrote she wanted to stay in her foster home. Condron testified T.F. recently completed another form in 2025, in which she wrote, "I want to be adopted this year." The court admitted the two all-about-me forms without objection.

¶ 27     On cross-examination, Rico P.'s counsel asked if Condron knew if T.F. understood the consequences of adoption. Condron testified T.F. was "familiar with the back and forth, what it's like to be in one home versus another home, and she's made it clear over the

years where she wants to be." When asked about T.F.'s desire to see her biological parents, Condron testified, "She's never mentioned [Rico P.] to me at all."

¶ 28 The State next called Keith Gargiulo, a volunteer CASA on T.F.'s case. He testified he had been assigned to T.F.'s case since March 2020. He confirmed T.F. expressed to him that she wanted to be adopted by her foster parents "as soon as possible." He explained T.F. was "vocal about it and does not want to hurt anyone's feelings, does not want people to think that she doesn't love them, but absolutely is definitive about her position that being adopted where she lives now as soon as possible is what she wants." Gargiulo testified the length of the case had negatively affected T.F., elaborating, "The uncertainty has and continues to cause her a lot of anxiety."

¶ 29 On cross-examination, Gargiulo stated he never observed a visit between Rico P. and T.F. He confirmed he discussed the consequences of adoption with T.F. Gargiulo testified T.F. "understands it" and "reconfirmed her desire to be adopted where she is." He noted he did not discuss guardianship as an option with T.F.

¶ 30 The State next called Angie K., foster mother to T.F.'s two younger sisters. Angie K. testified T.F. sees her sisters at least once a month and sometimes twice a month, in addition to the monthly visitation they have through the agency. She confirmed the three sisters also talk on the phone. Angie K. noted the sisters get along with each other.

¶ 31 On cross-examination, Angie K. testified that in 2024, T.F. had "[a]t least 12" visits with "her siblings outside of the regularly scheduled visit[s] through the agency." She said the visits sometimes occurred at her home, at T.F.'s home, or at church events. Angie K. testified she had no plans to move in the near future. In response to a question from the GAL, Angie K. noted T.F. would have sleepovers with her sisters.

¶ 32    The State next called Fawn K., T.F.'s foster mom. She testified she had fostered T.F. from 2014 to 2016 during the prior juvenile case. Fawn K. testified she still saw T.F. when she lived with her biological mother from 2016 to 2019. Fawn K. described T.F. as "very kind and considerate, friendly, everyone's friend, outgoing to a certain point, willing to try anything." Fawn K. noted T.F. was sensitive to her biological parents' feelings. T.F. would be quiet after visits and needed time to process the visits, but she "always has good things to say about the visits."

¶ 33    Fawn K. testified five people live in her household, two adults and three children. She said T.F. currently shared a bedroom with their other adopted daughter. Fawn K. stated the room was very big with a lot of space, two twin beds, and two dressers. She noted T.F. liked to play teacher with her sister and their room had "a little teacher's corner with a whiteboard." She testified T.F. had no special educational needs. T.F.'s extracurricular activities included volleyball, basketball, and drama. Fawn K. stated T.F. and the family attended church, and T.F. saw her biological sisters there. She confirmed the sisters "have some sort of fun activity" together at least once a month.

¶ 34    Fawn K. described her bond with T.F. as "a natural bond since we've had her from the time she was 11 and ½ months old." She testified she and her husband were "close with" T.F. She testified T.F. had no special medical needs and she and her husband could provide for T.F.'s emotional needs. She noted her family could foster T.F.'s background, culture, and identity. Fawn K. testified she loved T.F. and T.F. called her and her husband "[m]om and dad." She stated she was willing to provide T.F. with permanency through adoption.

¶ 35    On cross-examination, Fawn K. confirmed she fostered T.F. during the prior juvenile case. She testified T.F. maintained her cultural ties by attending the same school in the

same neighborhood where she lived with her biological mother. She noted she and her husband were not in favor of a guardianship and preferred adoption.

¶ 36　　　　Rico P. testified on his own behalf. When asked if he had a bond with T.F., he stated he, T.F., and his mother "spend a lot of time getting to know each other asking the questions about each other." He noted, "I feel like there's still so much more to be understood." He likewise confirmed T.F. shared a good relationship with his mother. Rico P. testified he took T.F. to the mall during visits, and he and his mother would buy her gifts. He noted they played Uno and T.F. talked to him about drama club and even invited him to her play. He testified he lived alone in a two-bedroom apartment and had a spare bedroom for T.F. He stated he would cooperate with the foster parents if they were T.F.'s guardians. He presented no other evidence.

¶ 37　　　　The GAL called Shannon Doubet, T.F.'s caseworker. She testified she filed a best-interest report on January 24, 2025. She confirmed she drafted the report and would testify consistently with the report. In the report, Doubet opined terminating the biological parents' rights would be in T.F.'s best interest, elaborating:

> "As evident by this report and previous permanency reports submitted to this court, [T.F.'s] basic need of safety and welfare including food, shelter, clothing, health, and education have been and are being met by the current foster parents for the last almost five years she has been in care. [T.F.'s] sense of security and familiarity lie within the foster family. She refers to them as her family and when she is upset, she wants to be with them. [T.F.] is involved in the community she lives in and enjoys spending time with friends. Her placement in this foster home is the least disruptive placement as there are no relatives that are willing and/or able to care for her."

With that, the parties rested and the trial court entertained their arguments.

¶ 38     In giving its decision, the court noted it considered the reports submitted from CASA and the agency, the witness testimony, counsels' arguments, and the statutory best-interest factors. Concerning T.F.'s physical safety and welfare, the court found "it's unlikely that any time in the near future [Rico P.] would be able to adequately and safely provide for the welfare of [T.F.], either food, shelter, health, clothing, and so." The court observed T.F. "is an interesting example of a young person who is in and out and back into the system." It explained, "[S]he seems to be extraordinarily well-adjusted considering everything. She's compassionate, intelligent, thoughtful, kind, and doesn't want to hurt anybody's feelings." The court determined T.F.'s "identity has been formed" and she became a young person "over the last five years, five plus years, and that's been in substitute care." The court found T.F. developed a bond with her foster parents and commended the foster parents for preserving T.F.'s ties to her biological siblings. The court further noted T.F.'s foster parents maintained her community ties by keeping her in the same schools so she could keep her friendships. The court credited the CASA reports as "moving *** as far as [T.F.'s] sense of attachment" to her foster parents. It found "that factor weighs heavily in favor of termination." The court also found T.F.'s "sense of security and familiarity, continuity of affection, least disruptive placements, all of those, the longer [she is] in care, the more it weighs in favor of termination and against preserving the parental rights." The court emphasized the length of the case, noting T.F. had been in substitute care for five years. It found T.F. needed permanency, finding "the need for stability and the continuity of relationships, community ties, all weigh in favor of termination." In sum, the court concluded:

>     "[W]eighing the statutory factors, there's very few that weigh against termination, and the vast majority weigh in favor of terminating the biological parents' rights.

So, the court would find the State has proven by a preponderance of the evidence that it's in [T.F.'s] best interest that the parental rights of *** [Rico P.] be terminated."

¶ 39    Rico P. filed a notice of appeal, and the trial court appointed counsel to represent him.

¶ 40    This appeal followed.

¶ 41                           II. ANALYSIS

¶ 42    Counsel moves to withdraw as appellate counsel for Rico P. In the motion, counsel states she read the record and concluded there exists no viable or meritorious grounds for appeal. Counsel further states she advised Rico P. of her opinion. This court advised Rico P. he had until May 27, 2025, to respond to the motion, and he did not do so.

¶ 43    Counsel supports her motion with a memorandum of law providing a statement of facts, a discussion of potential issues, and arguments why those issues lack arguable merit. Focusing on the fitness and best-interest hearings, she submits there are no irregularities or errors in the proceedings that could warrant an appeal.

¶ 44    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))).

¶ 45                           A. Unfitness Finding

¶ 46　　　　　"The State must prove parental unfitness by clear and convincing evidence." (Internal quotation marks omitted.) *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). The Adoption Act provides several grounds on which a trial court may find a parent "unfit," including those alleged here; the parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2024)) and the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 47　　　　　As it is used in section 1(D)(m)(ii) of the Adoption Act, "reasonable progress" means "measurable or demonstrable movement toward the goal of the return of the child." *In re L.L.S.*, 218 Ill. App. 3d 444, 460-61 (1991). We have previously described " 'reasonable progress' [a]s an 'objective standard,' " measuring whether " 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstratable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *L.L.S.*, 218 Ill. App. 3d at 461).

¶ 48　　　　　This court pays "great deference" to a trial court's fitness finding "because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *A.L.*, 409 Ill. App. 3d at 500. We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of

its individual facts" (internal quotation marks omitted) (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19), we now turn our attention to the facts of this case.

¶ 49 Based on a careful review of the record, we agree with counsel there is no issue of arguable merit concerning the trial court's unfitness findings. The court found the State proved clearly and convincingly that Rico P. failed to maintain a reasonable degree of interest, concern, or responsibility as to T.F.'s welfare (see 750 ILCS 50/1(D)(b) (West 2024)) and failed to make reasonable progress toward the return of T.F. to his care during the nine-month period from July 8, 2023, to April 8, 2024 (see 750 ILCS 50/1(D)(m)(ii) (West 2024)). The evidence supports these conclusions, and we take each in turn.

¶ 50 The State's evidence and the record showed Rico P. did not begin participating in the case until April 2021—nearly two years after it began. Even then, he did not begin services until 2022. Rico P. never explained his late entry into the case. The court concluded this alone proved clearly and convincingly his "lack of concern or interest in the child." Because the opposite conclusion is not clearly evident from this record, we cannot conclude the trial court's finding stands against the manifest weight of the evidence. *A.L.*, 409 Ill. App. 3d at 500.

¶ 51 At the start of the relevant nine-month period in July 2023, Rico P. had completed one service, namely, a psychological evaluation, and had not started any other ordered services. He began individual counseling in October, and by December, he began parenting classes and coaching. During this time, he refused to undergo a substance abuse assessment, and the few drug drops he did tested positive for marijuana. All told, Rico P. completed one service during the nine-month period—he finished parenting classes in January 2024. Nevertheless, he still required parenting coaching and assistance during visits with T.F. His visits with T.F. during this period were sporadic, and the two had neither bonded nor developed a rapport.

¶ 52      The two caseworkers who managed T.F.'s case during the nine months from July 2023 to April 2024, Schenk and Doubet, testified Rico P. was not a viable return home option for T.F. at any point during the period. Schenk noted that as of December 2023, Rico P. "had just started individual counseling," and his relationship with T.F. "needed some extensive work to get them to a place where [T.F.] would be comfortable going even closer to that kind of a goal." Doubet further noted that as of April 2024, Rico P. "still ha[d] outstanding services," and she had "ongoing concerns with his ability to meet [T.F.'s] needs as far as understanding where she is developmentally and what she needs."

¶ 53      Taken together, all the evidence proves clearly and convincingly that Rico P. failed to make reasonable progress between July 8, 2023, and April 8, 2024, and was an unfit person as defined by the Adoption Act. See *A.L.*, 409 Ill. App. 3d at 500; *L.L.S.*, 218 Ill. App. 3d at 460-61. The court's decision echoed the caseworker's conclusions that Rico P. "was not a viable return home target" because "[h]e still was struggling in most aspects of his life." The court explained, "We were no closer to a return home in April of 2024, then we were at the beginning of the nine-month period of time in July of 2023." See *F.P.*, 2014 IL App (4th) 140360, ¶ 88 (stating the reasonable progress standard measures whether a court could, in the near future, order the child returned to a parent's custody). And since the evidence does not point to the opposite result, the court's finding that Rico P. failed to make reasonable progress toward T.F.'s return home during the relevant nine-month period does not stand against the manifest weight of the evidence. *A.L.*, 409 Ill. App. 3d at 500.

¶ 54                          B. Best-Interest Determination

¶ 55      Once a trial court finds a parent an "unfit person," it must consider whether terminating that person's parental rights serves the child's best interest. "[A]t a best-interests

- 16 -

hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004); see *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating that once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child").

¶ 56　　　　When considering whether termination of parental rights serves a child's best interest, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2024). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 57　　　　A trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App

(2d) 160657, ¶ 16.

¶ 58        After careful review of the record, we agree with counsel there is no issue of arguable merit regarding the trial court's best-interest finding. The evidence established it was in T.F.'s best interest to terminate Rico P.'s parental rights. The evidence showed 12-year-old T.F. had lived with her foster parents for more than eight years of her life. T.F. had bonded to her foster parents and called them "[m]om and dad." They provided for T.F.'s needs—food, shelter, clothing, safety, security, education, and medical treatment. The foster parents also supported T.F.'s development, identity, background, and culture. Under their care, T.F. grew into a "well-adjusted," "compassionate, intelligent, thoughtful, [and] kind" young person. Moreover, the foster parents maintained T.F.'s relationship with her biological siblings. The CASAs testified T.F. expressed her desire to be adopted by her foster parents as soon as possible. The CASAs stated the length of this case and the uncertainty surrounding her future negatively affected T.F. and caused her anxiety.

¶ 59        Based on this evidence, the trial court determined it was in T.F.'s best interest to terminate Rico P.'s parental rights. The court carefully reviewed the best-interest factors vis-à-vis the evidence and concluded, "[W]eighing the statutory factors, there's very few that weigh against termination, and the vast majority weigh in favor of terminating the biological parents' rights." We cannot say "the opposite conclusion is clearly apparent" from the record, nor can we find the court's decision to be "unreasonable, arbitrary, or not based on the evidence." *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 60                                III. CONCLUSION

¶ 61        After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel this appeal presents no issue of arguable merit. Accordingly, for the

reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 62        Affirmed.